SPERRY (BLAKE v.). See Case No. 1,503.

## Case No. 13,236.

### SPERRY v. DELAWARE INS. CO.

[2 Wash. C. C. 243.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1808.

MARINE INSURANCE—NEUTRALITY—CAPTURS—CONCLUSIVENESS OF CONDEMNATION — MASTER'S INSTRUCTIONS.

1. Action on a policy of insurance, dated the 27th of June, 1807, on goods on board the Little William, from Philadelphia to Tonningen, or Hamburg, if not blockaded; warranted American property, proof to be made here. The captain was instructed, "If you can ascertain and obtain permission to go to Hamburg,

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

from the cruising vessel at the entrance of the Eyder, you will proceed; but on no account attempt it, unless you are well assured that the blockade of the Elbe is raised." The vessel was captured by a British cruiser, six hundred miles from Tonningen, and was condemned. The captain did not deliver his letter of instructions to the captors, until some days after he had delivered the ship's papers. The vessel and cargo were condemned by Sir William Scott, as enemy's property. The stipulation in the policy, as to the place where proof is to be made in support of the warranty, is not set aside by the sentence of a foreign court against the neutrality, but the same may be vindicated here. notwithstanding such sentence.

[Cited in The Delta, Case No. 3,777.]

2. The instructions of the owner, under which the master of a vessel, sailing to a port known to be blockaded. is directed to govern himself by information to be obtained at the mouth of the blockaded port, justify suspicions of an intention to violate the blockade; but these should cease. when it is manifest that the conduct of the captain was legal and fair.

3. If the instructions to the master violated any of the rules established in the court of admiralty of England, although such rules were against the laws of nations, the instructions should have been communicated to the underwriters.

4. The instructions of the plaintiff to the master, did not violate any of these rules, the vessel being destined to Tonningen, unless she should obtain permission at the entrance of a place not blockaded, to proceed to Hamburg.

5. The conduct of the captain, in not delivering the letter of instructions when captured, was imprudent: but was not such as should affect the assured.

The policy in question, was effected on the 27th of June, 1807, on goods, the property of the plaintiff [F. W. Sperry], an American citizen, on board the Little William, belonging to Jacob Sperry, also an American citizen, at and from Philadelphia to Tonningen, or Hamburg, if not blockaded; warranted American property, proof whereof to be made here. She sailed on the voyage insured, on the 3d of July 1807. On the 30th of June, the owner of the vessel, who was also the agent of the plaintiff, wrote a letter of instructions to his captain, in which he directs him "to proceed to Tonningen, and on arrival, to forward, by express, his letters to Mr. Vogell of Hamburg, to whom (he says) you are consigned, and under whose care you will place yourself. If you can ascertain and obtain permission to go to Hamburg from the cruising vessels at the entrance of the Eyder, you will proceed; but on no account attempt it, unless you are well assured that the blockade of the Elbe is raised." On the 31st of July, the Little William was captured in the British Channel, six leagues to the southward of Stare Point, and carried into Plymouth. The captain delivered to the captors all his papers, except the letter of instructions, and so stated in answer to one of the standing interrogatories; but it was afterwards given up, and was made use of in the cause. It appeared in evidence, that the place of capture was about six hundred miles from Tonningen: that Heligoland, a small island in the North Sea, inhabited by fishermen and pilots, belonging to Denmark, where

there is a light-house, kept at the expense of the Hamburgers, is nineteen miles from the mouth of the Elbe, and twenty from the mouth of the Eyder: that it is the dividing point, where all vessels destined to either of those rivers, or to the Weser, stop to take a pilot; and one of the witnesses said, that it is considered as being at the mouth of the Eyder: that Hamburg is about fifty-six miles from Cruxhaven, and this about twenty-five above the mouth of the Elbe: that the mouths of the Elbe and Eyder are about twenty miles apart; and that during the blockade, goods were permitted to be carried along shore from Hamburg to Tonningen; and sometimes they were carried over land from Hamburg to Tonningen, about eighty miles: that cruising vessels, not forming the blockading squadron, were frequently met with to the westward and southward of Heligoland, and sometimes to the eastward. The captain, upon his examination before the high court of admiralty, stated his destination, as mentioned in his letter of instructions, and that he intended to obtain information, whether the blockade was raised at Heligoland, and there to determine as to the course he should take; but on no account to go to the Elbe, unless he should there understand that the blockade was raised. It also appeared by the depositions of Vogell and a Mr. Sperry, at Hamburg, that they received letters from Jacob Sperry, apprizing them of this shipment; that the vessel was to go to Tonningen, unless the blockade of the Elbe was raised, and directing them to prepare a return cargo. That in consequence of these letters, they sent forward a cargo from Hamburg to Tonningen, and were afterwards obliged to ship it in another vessel, having heard of the capture of the Little William. There were many shippers of the cargo sent out in this vessel, and by all the bills of lading and invoices, it appeared that the destination was to Tonningen. The ship herself, and part of Jacob Sperry's cargo, were not insured. On the 23d of November, the ship and cargo were condemned, generally, as enemy's property. On the 12th of November, a regular abandonment was made and refused. The defendants' counsel offered to read the deposition of a clerk of one of the proctors in the court of admiralty, concerned in the cause there, in order to show what were the grounds assigned by Sir W. Scott, in delivering his opinion for the sentence of condemnation. This was at first opposed, but at length consented to by the plaintiff's counsel. The ground assigned was, that an American vessel, sailing to a port known to be blockaded, ought to inquire at some English or neutral port, whether the blockade is still subsisting, and not to do so from the blockading squadron at the mouth of the river so invested. That in this case, the instructions confined the captain to inquiries to be made of the cruising vessel, (in the singular,) at the mouth of the Eyder, which must mean the northernmost of the vessels, forming the

blockade. Of course this amounted to a breach of the blockade. In the copy of the letter of instructions, appearing on the record of the proceedings, this word is written "vessel." In the copy-book of Jacob Sperry, it is written "vessels," in the plural, and his clerk stated that he copied the letter truly.

It was objected, by the defendants, to the recovery: First, that the sentence of the court of admiralty, condemning this property for a breach of blockade, was conclusive; and that the clause added to the warranty of neutrality, that proof was to be made here, only applied to the property being neutral, but not to collateral points, such as the not conducting as a neutral. Secondly, that the sailing with a knowledge of the blockade, under instructions to ask permission and obtain information of the blockading squadron, was, according to the law of nations, a breach of blockade; that it appeared by the evidence in the cause, that the information was to be obtained from the blockading squadron. Thirdly, that the letter of instructions was material to the risk, and ought to have been communicated. Heligoland, the dividing point, is at the mouth of the Eyder, and so near to the Elbe, that it would of course be the place, about or near to which the blockading squadron would be. There, then, the inquiry was to be made. It was necessarily to be made of the vessels forming the blockade, because none others could grant permission to enter the Elbe. These two facts, then, bring the case precisely within the principles laid down by Sir W. Scott, in the cases of The Betsey [1 C. Rob. Adm. 332] and that of The Posten [note to 1 C. Rob. Adm. 332], decided in 1799, and that of The Spes and The Irene [5 C. Rob. Adm. 76], decided in 1804. These cases were, or ought to have been, known to the insured; and, therefore, his letter of instructions exposing the property to this peril, ought to have been communicated. On the subject of concealment, was cited 7 Term R. 162. Fourthly, the conduct of the captain, in omitting to surrender his letter of instructions to the captors, increased the danger of confiscation, for which the insured is liable. 2 C. Rob. Adm. 28; 3 C. Rob. Adm. 143, 153. To prove that parol evidence was admissible to explain the ground of condemnation, was cited 2 Doug. 554; [Vasse v. Ball] 2 Dall. 272; 7 Term R. 527; Dederer v. Delaware Ins. Co. [Case No. 3,733], in this court.

For the plaintiff, it was argued, that the destination of this vessel, under all the circumstances of the case, did not amount to a breach of blockade. Vattel, bk. 3, c. 7, § 117. Intention to break a blockade, without an attempt, is not sufficient. Fitzsimmons v. Newport Ins. Co. [4 Cranch (8 U. S.) 185], in the supreme court of the United States. Sailing to a blockaded port, knowing it to be so, is not a breach. 3 Caines, 235; 5 C. Rob. Adm. 76. The instructions, it was contended, were not material; because, in this case, the inquiry was not to be made of the blockading squadron at the mouth of the Elbe, but was to be made at the mouth of the Eyder. As to the conduct of the captain, this was not a ground of condemnation.

THE COURT stopped the counsel, as to the conclusiveness of the foreign sentence, observing, that they adhered to what was said in the case of Calbreath v. Gracy [Case No. 2,295]. The stipulation, as to the form in which the proof is to be made, is co-extensive with the warranty of neutrality.

Mr. Levy, Jared Ingersoll, and Charles J. Ingersoll, for plaintiff.
Rawle, Coudy & Tilghman, for defendants.

WASHINGTON, Circuit Justice (charging jury). For the satisfaction of the parties, and particularly of the one against whom the court will decide, it may be proper to observe, that in few instances have we seen a case where either party was more excusable for coming into a court of justice, than the present. The court has felt extreme doubt upon one of the points, and our opinion, which is now settled, has wavered considerably, during the very able discussion which we have heard. Whether the decisions of Sir W. Scott, as given in the cases cited from Robinson, are, to the extent to which they are contended to go, agreeable to the law of nations, may well be doubted; there is, in our opinion, less room to doubt as to the application of those principles to the case now under consideration. As a rule of evidence, there can be no reasonable objection to the doctrine laid down in this case. It certainly is a very suspicious circumstance, that a neutral vessel, even though it be an American, should sail upon a destination to a port known to be blockaded, with instructions, or with a known intention to be governed, as to her ulterior progress to that port by the information she might obtain at the mouth of the river, from the vessels forming the investment. It might well be said, that your coming here to ask a foolish question, or to solicit a permission so unlikely to be granted, is strong evidence that you meant to go in, if time and opportunity had offered. But to consider that as an actual breach of blockade, which is only evidence of an intention to commit a breach, seems to extend a mere measure of precaution and of preventive legal policy, (as the judge expresses himself in one of the cases cited,) beyond the necessity which created the rule. In this case, the light of heaven was not more clear, than the honest neutral destination of this vessel, and of course this court must say, that the foreign court was not warranted in pronouncing that her conduct amounted, really or technically, to a breach of the blockade of Hamburg. Indeed, we have the authority of Sir W. Scott himself for this opinion. In the case of The Betsey [supra], decided in May, 1799, her destination was to Amsterdam, a port known to be blockaded before she left America; and the instructions were to go to

Hamburg, if she should not be so fortunate as to get into Amsterdam, owing to the English ships still keeping up the blockade, which, it is said, "you will know by speaking those which lie off." This was as strong a case as could well have occurred for the application of the rule, and yet, in consideration of the fairness of the transaction, appearing from other evidence, she was acquitted. In the present case, it is obvious that the judge was entirely influenced by the circumstance, that the inquiry was to be made, and the permission obtained, from the cruising vessel at the entrance of the Eyder, which he construed to mean one of the blockading squadron. But, if this had been the meaning, we cannot conceive how this decision is to be reconciled with that just quoted. Whether the expression in the original letter was "vessel," or "vessels," may properly be left to the jury to decide, upon the evidence; but, even if it were the former, we think it is obvious that the latter was intended, from the manifest absurdity of pointing to a particular vessel, of which it was impossible the American owner could have had any knowledge. Upon this point, therefore, we are of opinion, that the warranty of neutrality was not falsified.

The important, and by far the most difficult question, still remains to be considered. Did the letter of instructions expose the property to a risk not contemplated by the policy? If it did, and if it was material in your opinion, then the policy is void. In this point of view, it is immaterial whether the decisions of Sir W. Scott, in 1799 and 1804, were consistent with the law of nations, or not. If not so, still the danger of capture and loss was as certain, as if the rule laid down had been in all respects correct. What was this risk?—That a vessel, destined to a blockaded port, known before her sailing to be blockaded, with instructions to go elsewhere, only in the case of her being turned away by the blockading squadron when on their station, is considered as guilty of a breach of blockade, and subject to confiscation. This rule was known to the insured and to the underwriters, or ought to have been known to them; but whether the vessel was placed in a situation, where the rule would apply, was known only to the insured. It is in vain for the insured to say, that he mistook the meaning of those decisions, or that he did not suppose the instructions were at all material to be known by the underwriters. If the case were even doubtful, it was his duty to give to the other contracting party, equally with himself, an opportunity of judging. If he has acted wrong, though without intention, and is of course innocent in a moral point of view, so are the underwriters; and the rule is clear, that if one of two innocent persons must suffer a loss, he who has occasioned the loss must bear it. The question then is, did this letter expose the property to the risk, of which both parties are presumed to be apprized? Let it be supposed that the author of this letter, at the time he wrote it, had Sir W. Scott's decisions before him. In the case of The Betsey, he would discover, that an American vessel, destined to a blockaded port, known before she sailed to be in that situation, and with directions to make inquiries of the blockading squadron lying off, was acquitted. This of course would excite no alarm. In the case of The Posten [supra], he would discover, not only that she was a European vessel, and in this respect less favoured than an American vessel, but that her destination was to a blockaded port, and that she was to receive information from the blockading squadron on that destination. He would of course think it not prudent, to give such directions to the captain of his vessel. Looking upon the case of The Spes and The Irene [supra] he would observe that these too were European vessels; that the owners knew of the blockade of the Elbe, yet instructed their captains to continue their course to Hamburg, till they should be warned, and turned away.

With these cases before him, what were the orders given in this case, by the owner of this vessel?—To proceed to Tonningen, a port not blockaded; but in case the captain could ascertain and obtain permission to go to Hamburg, he was in that case to go there. From whom, then, was he to obtain information and permission? The answer is obvious—permission from some of the blockading squadron, in case he should meet with any at the entrance into the Eyder—information from any other cruiser in the same place, provided none of the blockading squadron should be there. Where was the information and permission to be obtained?—At the mouth of the Eyder. But, to constitute this offence, according to the decisions I have alluded to, it was not sufficient, that the inquiries should be made of the blockading squadron, but it must have been at the mouth of the river; for it is clear, that if they had been met with at a distance from their station, there was no objection to the inquiry being then made. But in this case, it was to be made of them, or of any other cruisers, not at the mouth of the Elbe, the invested river, but at the mouth of the Eyder, which was not invested, and where it was lawful for this vessel to go. The difficulty which weighed with the court, for a considerable time, was produced by the evidence of one of the witnesses, who stated that Heligoland was considered as at the mouth of the Eyder; which seemed to produce some doubt, at least, whether, if the inquiry was to be made of one of the blockading squadron, at a place considered to be the mouth of the Elbe, as well as of the Eyder, the case was not within the principle laid down in 1804. But, when the geographical situation of these places is considered—that Heligoland is in the direct and legitimate course to Tonningen, and that from that spot the courses to the two rivers diverge; that, in point of fact, this little island is twenty miles distant from the real junction of the Eyder and the Elbe, with

the sea; and that the expression is not, that the information is to be obtained at the mouth of the Elbe, or even at Heligoland, but expressly at the entrance of the Eyder—it is plain, that the intention was, that she should look out for some vessel to the eastward of Heligoland, and in a course which she was permitted to pursue, and different from that which would have led her to the mouth of the Elbe. If the blockading squadron had discovered her pursuing that course, it would have been obvious, that she was not intending, or in a situation to bring herself within the letter or the meaning of the rules laid down by Sir W. Scott. Had her course been towards the mouth of the Elbe, the case would have been different. Upon this point, therefore, we are of opinion that the letter of instructions did not violate any decisions in England, prior to this insurance. As to the conduct of the captain, although certainly imprudent, yet it was not such as ought to affect the insured. This was not, in the slightest degree, relied upon by the court, as contributing to the condemnation of the property. It is incidentally glanced at by the judge, more in the spirit of admonition, than of severe censure.

Verdict for plaintiff.